IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 20, 2025

**STATE OF TENNESSEE v. BYRON PIPKIN**

**Appeal from the Criminal Court for Shelby County**
**No. 22-03734          Lee V. Coffee, Judge**
_____

**No. W2024-00771-CCA-R3-CD**
_____

A Shelby County jury convicted the Defendant, Byron Pipkin, of first degree premeditated murder, especially aggravated kidnapping, possessing a firearm as a convicted felon, possessing a firearm during a felony, and possessing a handgun as a convicted felon. The trial court imposed an effective life sentence plus sixty-eight years in the Tennessee Department of Correction. On appeal, the Defendant asserts that the evidence is insufficient to support his first degree premeditated murder conviction and the trial court erred when it admitted prejudicial information. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and MATTHEW J. WILSON, JJ., joined.

Joseph McClusky (on appeal), Juni Ganguli (at trial), and Katherine Oberembt (at trial), Memphis, Tennessee, for the appellant, Byron Pipkin.

Jonathan Skrmetti, Attorney General and Reporter; Ryan W. Davis, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Alanda H. Dwyer and Leslie Byrd, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from a domestic incident in Shelby County, Tennessee. Following an argument, the Defendant shot his girlfriend ("the victim") in the back as she fled their shared residence in Cordova, Tennessee. For his conduct, a Shelby County grand jury indicted the Defendant for first degree premeditated murder, especially aggravated kidnapping, possession of a firearm as a convicted felon, possession of a firearm during a

dangerous felony, and possession of a handgun as a convicted felon. The case proceeded to trial and the parties presented the following evidence.

On the morning of June 30, 2022, Shelby County Sheriff's Office ("SCSO") Deputy Briana Shaw and Deputy Scott Palmer were assisting with a domestic complaint when they learned of another reported incident in the same neighborhood. Deputy Shaw and Deputy Palmer quickly responded to a residence on Cross Wood Lane ("Cordova house") in Shelby County, Tennessee. When they first arrived, it was "quiet," leading Deputy Shaw to believe that perhaps there had been a false report. A young child let the deputies inside the house. Deputy Palmer cleared the house, finding only children and no potential suspects. Deputy Shaw proceeded to the garage where she found a "lifeless" body.

Deputy Shaw observed bullet holes on the victim's chest. As she performed CPR on the victim, she saw an "older child come across from the car." Deputy Shaw was unaware there was anyone else in the garage. The child, later identified as the victim's son JB[1] , approached her, crying. She instructed him to go into the house. After the paramedics arrived, Deputy Shaw entered the house and spoke with JB. She relayed the information JB provided to other officers working on the case.

Deputy Shaw wore a body camera while at the scene. The State played portions of the body camera footage for the jury. The video clips were consistent with Deputy Shaw's testimony showing a young boy walk out from behind the car in the garage, crying. Another clip showed Deputy Shaw comforting JB inside the house. She asked him who shot his mother, and he stated the Defendant's name, "Byron Pipkin." JB described the Defendant's appearance for Deputy Shaw, and the events that led up to the shooting. He said the Defendant and the victim argued, and the Defendant followed the victim to the garage with a gun.

Deputy Palmer also spoke with JB, who identified the Defendant as the shooter and who reported that the Defendant had driven away with his sister, LT. The State played clips from Deputy Palmer's body camera recording. JB consistently identified the Defendant to Deputy Palmer as the shooter.

JB was twelve years old at the time of trial and eleven at the time of the shooting. He recalled that in June 2022, the Defendant, the victim, and the victim's six children lived in the Cordova house. The victim's children living in the house at the time of this incident were JB, six-year-old LT, nine-year-old AB, seven-year-old ZT, four-year-old ZT, and two-year-old WT. On the day of the shooting, WT and an older brother, BG, were not at the house. JB recalled that, when he woke up on the morning of June 30, 2022, the victim

---

[1] For purposes of privacy, it is the policy of this court to refer to minors by their initials.

was crying. JB asked the victim twice what was wrong. She told him that she was tired of the Defendant.

JB recalled that the victim had taken some of her children to have their hair cut by their father, Wadell Thomas, and the Defendant was angry about it. The victim had not told the Defendant about the haircuts because "[s]he was afraid [the Defendant] was gonna put his hand on her." That morning the Defendant had asked JB's younger brothers who had cut their hair and when they would not tell him, he became angry. Four-year-old ZT went to the kitchen and told the victim about the Defendant's inquiry, and then the argument between the Defendant and the victim began. The victim walked out to her car in the garage, followed by JB, while the Defendant went to retrieve his gun.

JB testified that both the victim's blue Mercedes and the Defendant's white Mercedes were parked in the garage. The victim entered the driver's seat of her Mercedes, and the JB got into the backseat. The victim was trying to call someone on her cell phone when the Defendant entered the garage holding a gun. He pointed the gun at the victim and ordered her out of the car. The victim exited the car and tried to run to a nearby neighbor, whom JB referred to as "the sheriff." The Defendant fired the gun twice at the victim as she fled, and she fell to the ground. The Defendant told the victim to get up and when she did not, he dragged her back to the garage. JB stayed inside the car, crying and trying to call his older brother, BG.

The Defendant pulled his car out of the garage and then went inside the house to get LT. Before the Defendant left with LT, he called the police. JB heard the Defendant report that "somebody" had shot the victim. The Defendant closed the garage door as he left in his car. JB went inside the house to tell his sister that the victim had been shot. He then returned to the car. Once JB heard the police officer in the garage, he exited the car, and Deputy Shaw told him to go inside the house.

JB recalled Deputy Shaw speaking with him inside the house. JB said that he identified the Defendant as the shooter and that he told Deputy Shaw that the Defendant had driven away with LT. JB also told a male officer that the Defendant had shot the victim. JB waited with family members as law enforcement processed the scene. He was then transported for a forensic interview. The audio recording of this interview was played for the jury. JB's responses to questions about the shooting were consistent with his trial testimony.

JB agreed that the day of the shooting was not the first time he had witnessed the Defendant and the victim arguing. He recalled one occasion "around Easter" when the victim gave JB her cell phone with the instruction to call the police if the Defendant "put his hand on [her]." The Defendant followed the victim into their bedroom and closed the

3

door. JB heard "[l]ike banging into the wall and the bed." The Defendant then exited the bedroom and said that he was going to "shoot the police," if they came to the house. The Defendant left, and JB called the police. On another occasion, the victim and the Defendant went to pick up her children and, when they returned, the victim had "a busted lip."

Danielle Harrell, West Tennessee Regional Forensic Center Assistant Medical Examiner, reviewed the autopsy report prepared by a colleague. Dr. Harrell reviewed the entire case file and concluded that the twenty-eight-year-old victim died of a gunshot wound to the chest and the manner of death was homicide.

SCSO Deputy Justin Headley arrived at the Cordova house at 4:00 p.m. to photograph the scene. The victim had already been transported to the hospital. The State introduced photographs of blood on a grassy area near a tree in the yard and blood on the Cordova house driveway. A sample of the blood was collected and a presumptive test indicated that the substance was positive for human blood. Inside the garage, Deputy Headley photographed a "large pool" of what appeared to be blood and a spent projectile. The paramedics cut clothing from the victim's body and the spent projectile had fallen out of the clothing.

SCSO 911 Dispatcher Bridgett White received a call just before noon on June 30, 2022. The man identified himself as "Darrel Davis," but through the course of the investigation, Dispatcher White learned that the caller was the Defendant. The Defendant told the dispatcher that someone had shot his girlfriend and that he was pursuing the shooter who was driving a white Mercedes.

The State recalled Deputy Shaw who testified that one of the victim's family members came to the shooting scene that day. This family member assisted in connecting Deputy Shaw with the Defendant by cell phone. Deputy Shaw spoke with the Defendant on the phone about a possible place to meet.

Jacquanna Henderson, the victim's cousin, testified that the Defendant called her on June 30, 2022, and told her that she should check on the victim "because his gun had went off on her." According to Ms. Henderson, the victim and the Defendant had been dating for five or six months. Ms. Henderson asked whether the Defendant had notified the police, and he confirmed that he had. He provided Ms. Henderson with the Cordova house address. When she arrived, the victim had already been transported to the hospital. Ms. Henderson spoke with deputies and told them about her phone call from the Defendant. She also told the deputies that Wadell Thomas, some of the children's father, was on his way to the Cordova house. Ms. Henderson had told him about the shooting and given him the address.

4

Ms. Henderson connected Deputy Shaw with the Defendant by cell phone. The State played footage from Deputy Shaw's body camera of the communication with the Defendant. The Defendant had told Ms. Henderson that he was taking LT to his sister's house. He then told Deputy Shaw that he was taking LT to "the beauty shop." Ms. Henderson identified the voice on the recordings as the Defendant's voice.

Ms. Henderson recalled that, approximately thirty minutes before the Defendant called her, the victim had called her. The victim was crying and told Ms. Henderson that she was tired. She said that she was going to tell the Defendant to move out and, if he "put his hands on [her]," she would "run next door to the sheriff's house."

SCSO Sergeant Reginald Reed also interacted with the Defendant through Ms. Henderson's cell phone. Sergeant Reed attempted to get the Defendant to provide his location to try to find LT. About the Defendant's response, Sergeant Reed said:

> For the most part, he kept telling us where he was, that he was, I think, on Germantown Parkway. He was near Wolfchase. He was, I think, on Highway 64. He just kept giving different locations . . . . But . . . none of them were really panning out.

Sergeant Reed said that deputies would respond to those locations, but the Defendant would not be there. Sergeant Reed unsuccessfully attempted to get the Defendant to return to the Cordova house.

Robbie Hatchett dated LT's aunt, Dominque Merit. Ms. Hatchett had met the Defendant through the victim. The victim had lived near Ms. Hatchett for several months before moving to the Cordova house. On June 30, 2022, LT appeared at Ms. Hatchett's front door. Ms. Hatchett recalled that she looked through a window and saw a white car "pulling off." Curious, Ms. Hatchett opened her front door and saw LT standing there. LT was not wearing any shoes and was holding a piece of paper with a phone number on it.

Ms. Hatchett called Ms. Merit, LT's father - Mr. Thomas, and the number on the paper, which she learned was LT's grandmother. At some point, a police officer arrived to check on LT's welfare. LT was later transported to the Child Advocacy Center.

AB testified consistently with his brother JB about the living arrangements at the Cordova house. On the day of the shooting, he heard the victim and the Defendant arguing in their bedroom. AB saw the victim walk to the garage followed by the Defendant who was carrying a gun. AB stayed inside the house, but he heard two or three gunshots, after which, the Defendant came into the house and took LT with him. AB said that the Defendant drove away in a white Mercedes.

5

AB recalled that deputies arrived at the Cordova house, and he told them what had occurred. He also told the deputies that the Defendant had taken LT. AB said that LT had been wearing "night clothes" and was not wearing shoes when the Defendant took her.

LT testified that, on the day the victim was shot, the Defendant drove her to "[her] T.T.'s house."

On July 1, 2022, SCSO Deputy William Estredge located the Defendant at The Economy Inn on Ketchum Road. The Defendant's white Mercedes was in the parking lot, and surveillance video showed the Defendant exiting the vehicle and entering one of the rooms. Deputies waited for the Defendant to exit the room. As the Defendant walked down the stairs outside his upstairs room, Deputy Estredge addressed the Defendant who fled back into the room where he remained for an hour. Deputy Estredge spoke with the Defendant from outside the door but, when the Defendant refused to exit, Deputy Estredge requested the S.W.A.T unit. The S.W.A.T. unit arrived and worked another hour to get the Defendant out of the room. Once officers gained entry, they found a female was also in the room.

SCSO Detective William Hampton, pursuant to a search warrant, searched the Defendant's Mercedes and found a gun located in the glove box. The gun's magazine was not fully loaded. In the center console of the car, law enforcement found a credit card with the victim's name on it and a "benefit security card" with the Defendant's name on it. Deputies also found a cell phone in the center console with what appeared to be a blood "smear" on the top corner.

The Defendant testified that he began his relationship with the victim via Facebook during the second week of December 2021. He recalled that the relationship started out "pretty good." He described the victim as sweet, kind, good-hearted, and loving. He noted that she was also quick-tempered. The Defendant acknowledged that he and the victim argued "[a] few times" over the victim "ma[king] a fake page" and the Defendant "going out of town" and "talking" to other women. He added that they had "the argument that led up to the incident [involving] the boy's haircut." He described these arguments as "verbal" with the victim getting "loud." He said their arguments were "rarely" physical. He denied ever hitting the victim or arguing in front of the victim's children.

Upon further questioning, the Defendant conceded that "a few times" the arguments became physical. He described it as "tussl[ing]." The Defendant said that the "tussling" was largely initiated by the victim. He said that during arguments he "always tr[ied] to calm [the victim] down."

6

In March 2022, the Defendant and the victim moved into the Cordova house with the victim's children. The Defendant stated that he was very involved in the children's lives. He drove them to and from school and "everything like various things." The Defendant worked construction at the time and contributed to paying the household bills. According to the Defendant, the victim had not worked other than "DoorDash" for a month.

The Defendant recalled that, in the days leading up to the shooting, he and the victim argued on June 28th, June 29th, and June 30th. The first disagreement centered around the children's haircuts. The Defendant said that the victim wanted him to take the boys to get their hair cut, but the Defendant refused because the last time he had done so, the victim had been unhappy with the haircuts. The argument on June 29th was about the Defendant taking a trip to Houston without the victim. The Defendant was taking the trip with "Melanie." The victim was aware the Defendant was going on the trip with someone, but she did not know who. The victim was also angry because the Defendant was exchanging text messages with "Atlantis" who was the Defendant's "ex-friend." When the victim learned of the text message exchange with Atlantis, she threatened the Defendant.

On June 30, 2022, at around 10:30 a.m., the victim woke the Defendant up and told him she was going to take LT "somewhere." He assumed that she was taking LT to get her hair cut since they had just had the boys' haircut. The victim also asked the Defendant for $200 to pay the Verizon bill. When the victim returned, the Defendant was on the phone with his friend in Texas while preparing his backpack for the trip. Overhearing the excitement over the trip, the victim walked out and slammed the bedroom door. The Defendant then heard the door to the garage slam. The Defendant showered and then began taking items out to his car for the trip.

The Defendant testified that as he packed his car, the victim sat in her car "fussing and yelling." The Defendant went back inside the house and told LT to come with him because LT was supposed to get "her hair done by Maresha," the victim's cousin. The Defendant returned to the car and was preparing to back out when the victim got out of her car and confronted the Defendant about the text messages with Atlantis. The Defendant described the victim as "very loud." The victim's behavior made the Defendant feel angry and frustrated. The Defendant "nudged" the victim's hands out of his face, and the victim "upped the firearm" and said, "I'll kill you." The Defendant was unaware the victim had a gun in her hand until that time. He said that she normally kept the black gun in the glove compartment of her car or under the driver's seat.

After the victim pulled the gun, the Defendant backed away from her. The victim again put the gun in the Defendant's face, and the Defendant put his hand over the gun to try to take it from the victim. They struggled over the gun with the Defendant ultimately gaining control of the weapon. The victim tried to run away. The Defendant reached out

7

to try to grab the victim, but he ended up "clipping her." They both stumbled a bit and when the Defendant tried to regain control of the gun, it discharged. The victim continued to run but then said, "I'm shot," and fell to the ground.

The Defendant testified that he went to where the victim was lying in the yard and asked if she was okay, where she had been hit, and if she wanted to go to the hospital. She responded, "yeah," but then communicated no further, so the Defendant called 911. The Defendant said he was panicked with worry over the victim. He picked her up and took her to the garage. After considering whether to take the victim directly to the hospital, the Defendant decided that emergency personnel would be more efficient, so he left her in the garage. He explained that he left because there were "plenty of things going with the police killing people." When asked why he told 911 that Wadell Thomas shot the victim, he replied that he "wasn't thinking."

About LT, the Defendant said that he went into the house to grab his phone. LT was standing in the hallway and followed him out to the garage. He said that he took LT because he was "supposed to be taking her anyway." He agreed that, in retrospect, this was not a reasonable thing to do given the circumstances. The Defendant planned to take LT to Maresha's beauty shop; however, he altered his plan when the police called him on his cell phone and threatened to charge him if he did not return LT. As a result, he took LT to the nearest place that she was familiar with, Robbie Hatchett's house. The Defendant left LT at the house with LT's grandmother's phone number.

The Defendant denied that he intended to kill the victim but agreed that he was responsible for firing the gun "that took [the victim's] life."

On cross-examination, the Defendant agreed that he had been convicted of aggravated assault, two counts of possessing a gun as a convicted felon, possessing contraband in a penal facility, and failing to appear on a felony indictment. The Defendant agreed that he also had a quick temper but said he had better control of his temper than the victim.

The Defendant denied any knowledge that the police had responded to a domestic incident at the Cordova house in April. The State provided the incident report that indicated that the Defendant had become irate and yelled obscenities at the victim because her children's father had called her from jail. The Defendant maintained that he was "not familiar with it."

The Defendant testified that, after his arrest, he told officers that he had swallowed the Mercedes key and needed to go to the hospital. The Defendant admitted that he did not swallow his Mercedes key, but rather he needed medical attention because his asthma "was

8

flaring up." Once at the hospital, the Defendant locked himself in the bathroom, requiring hospital personnel to use a key to open the door. The Defendant claimed he came out of the bathroom on his own and denied engaging in a struggle with two officers following the bathroom door being opened. The Defendant maintained that he was solely concerned about the victim's welfare during this time. He agreed that he took the gun and the victim's cell phone with him when he left the Cordova house.

On redirect examination, the Defendant stated that he had not intended or planned to shoot the victim that day because "[e]verything was going fine with us."

In rebuttal, the State called SCSO Detective George Selby who was present when the Defendant was taken into custody. The Defendant was detained in a patrol vehicle and Detective Selby explained the next steps in the investigation to the Defendant. The State played a recording of the interaction for the jury. In the video recording, Detective Selby told the Defendant that he would be transported to the precinct to be given the opportunity to tell law enforcement what had occurred. Sergent Selby informed the Defendant that he did not have to speak with law enforcement but to "consider it." The Defendant responded that there were no witnesses to the incident, only the Defendant, the victim, and God.

SCSO Deputy Munim Haydari testified that he assisted in transporting the Defendant to the hospital. Police protocol required that the Defendant be transported for medical treatment based upon the Defendant's statement that he had ingested his Mercedes key. At Regional One Health, the Defendant asked to use the bathroom. A deputy escorted the Defendant to the bathroom. Deputy Haydari checked on the Defendant and found the bathroom door locked. Deputies repeatedly asked the Defendant to come to the door, and he replied that he needed more time. After a period of time, deputies requested a nurse to assist in opening the door with keys. The Defendant met them at the door and a struggle ensued to handcuff him. Back up officers were requested and arrived to assist. The State played footage of the incident from Deputy Haydari's body camera.

The parties entered a stipulation that the Defendant had been previously convicted of a felony that involved violence to a person and a felony that did not involve violence to a person. The parties further stipulated that, at the time of those convictions, a judge told the Defendant he could not legally own, possess or have access to a gun.

After hearing the evidence, the jury convicted the Defendant of first degree premeditated murder, especially aggravated kidnapping, possessing a firearm as a convicted felon, possessing a firearm during a felony, and possessing a handgun as a convicted felon. The trial court imposed a life sentence plus sixty-eight years. It is from these judgments that the Defendant appeals.

9

## II. Analysis

On appeal, the Defendant asserts that the evidence is insufficient to support his conviction for first degree premeditated murder and that the trial court erred in allowing the Detention Response Team to sit near him during trial. The Defendant does not challenge the sufficiency of the evidence regarding his remaining convictions. The State asks this court to affirm the trial court's judgments in all respects.

### A. Sufficiency of the Evidence

The Defendant asserts that the State failed to prove that he acted with premeditation. The State responds that the evidence established that the Defendant acted intentionally and with premeditation. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony

of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2018). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2018). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d) (2018).

The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor

11

from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

The evidence, viewed in the light most favorable to the State, showed that the Defendant and victim were arguing. The unarmed victim went to the garage and got into her car while the Defendant went to get a gun. He then went to the garage and ordered the victim out of the car. The victim exited the car and then tried to run to a nearby neighbor's house. As she fled, the Defendant shot the victim in the back, killing her. He then moved her body inside the garage, closed the garage door, and drove away. He notified the police of the shooting, but he lied about the details and his whereabouts, frustrating the investigation. The Defendant was later located in a motel room with a gun and the victim's cell phone.

As to premeditation, the State provided the couple's ongoing disagreements and the victim's decision to ask the Defendant to leave the residence as motive for the shooting. Other factors indicating premeditation were that the victim was unarmed, the Defendant went to get his gun after the victim had ended their argument and left the room, and the Defendant followed the victim out to the garage with the gun. Following the shooting, the Defendant fled, taking evidence of the crime, the gun and the victim's cell phone, with him. He provided false details to attempt to cover up his role in the murder and delay the police investigation of the shooting. This evidence supports a finding that the Defendant acted with premeditation.

Accordingly, we conclude that the evidence is sufficient to show that the Defendant acted intentionally and with premeditation when he shot and killed the unarmed victim in the back as she fled from him. The Defendant is not entitled to relief as to this issue.

### B. Admission of Alleged Extraneous Prejudicial Information

The Defendant argues that the presence of the Detention Response Team ("DRT") officers at trial exposed the jury to extraneous prejudicial information. He contends that because the DRT officers were seated behind the Defendant, it allowed the jury to make the improper inference that the Defendant was dangerous and required extra security. The State responds that the Defendant has failed to show that the jury was exposed to such information. We agree with the State.

First, we note that the Defendant failed to include in the record the trial court's order requiring DRT officers to escort the Defendant to court or the transcript from the court hearing when the trial court determined that DRT officers were necessary. As the State did, we will summarize what occurred based upon the objection raised the day of trial and argument at the motion for new trial.

12

On the day of trial, the Defendant orally raised concern about DRT officers sitting behind him in the courtroom. The trial court provided the following background for why the DRT officers were present.

> I actually entered this order the last time [the Defendant] was in court. [The Defendant] has been very uncooperative with the Court. Engaged in disruptive behavior. Refusing to stay in the courtroom. When I was in the process of setting this case for a motion hearing, [he] walked out of the courtroom while I was attempting to discuss the trial process with him on February 9th, 2024. And told the Court that he's refusing to go to trial in February with his appointed attorney.
>
> So that's what [the Defendant] told the Court, and that's why I entered this order to have [the Defendant] escorted to court by DRT, because he was disrespectful to the Court. He was on the borderline of being belligerent to the Court, and walked out of the courtroom, not withstanding my trying to talk to [the Defendant]. And told the Court he was not going to trial today.
>
> So that's why I entered this order to have him escorted to court. And I was told earlier this morning that [the Defendant] was - - they were having some problems, some issues, with getting him in court this morning.

With respect to the DRT officers sitting behind the Defendant, the trial court noted the limited capacity of the courtroom and the trial court's anticipation that the gallery would be full. As such, there was no alternative seating for the DRT officers. The DRT officers would be seated behind the defense table in the front of the gallery. Additionally, there were other sheriff's deputies in the courtroom for various reasons related to the trial. Based upon that, the trial court found that there was no indication that the two DRT officers were there specifically for the Defendant among the other uniformed personnel.

At the motion for new trial hearing, no evidence was presented and both parties offered argument. The trial court made the following findings as to this issue:

> [The Defendant] was dressed out in civilian clothing. . . . In this court, we do not chain people. We do not have folks in court with . . . restraints. . . . The folks that escorted him back and forth to court, did not sit on a level with him. They are law enforcement officers with law enforcement uniforms on.

13

There's absolutely nothing that says those two folks that escorted [the Defendant] to court were here because of [the Defendant]. We had four or five other Shelby County Sheriff's Deputies that were involved in this trial. Four that are assigned to my courtroom, a fifth deputy in all first-degree murder cases. And from time to time, the person who was driving the van will be in the courtroom.

So you probably had 10 uniformed Shelby County Sheriff's Deputies in court when this case was tried. There is absolutely nothing that said that any of these folks are here specifically for [the Defendant]. There's nothing that indicated [the Defendant] was, in fact, in custody or was detained.

There's nothing that indicated that there's some indicia that he's dangerous because we had DRT officers in the court. Those DRT officers were assigned on this case because of some things that [the Defendant] had done since he's been in custody. Some things that he had done before he got arrested. Struggling with police offers at the Regional One Medical Center when he was there because he claimed he swallowed the key to his car. . . .

And they had to tussle with him, had to fight with him. Had to get him restrained because they believed that he was trying to escape when he had locked himself in a bathroom . . . . So . . . he's being escorted to court for his safety, for the safety of court personnel and other folks. But there's absolutely nothing about two DRT officers that sat behind a concrete railing on the first row of the courtroom where the general public sat in this courtroom, there's nothing that would indicate that those folks are here escorting [the Defendant]. No indicia that he's in custody. No indicia that he is dangerous.

A defendant is entitled to a trial "by an impartial jury," with the jurors "render[ing] their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge." U.S. Const. amend. VI; Tenn. Const. art. I § 9; *State v. Adams*, 405 S.W.3d 641, 650 (Tenn. 2013). "When a jury has been subjected to either extraneous prejudicial information or an improper outside influence, the validity of the verdict is questionable." *Adams*, 405 S.W.3d at 650.

[E]xtraneous prejudicial information is information in the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case. An improper outside influence is any unauthorized private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury.

14

*Id.* at 650-51 (internal citations and quotations omitted).

When a defendant challenges the validity of a verdict on the basis of a tainted jury, he "must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." *Id.* at 651. If a defendant makes this showing, "a rebuttable presumption of prejudice arises and the burden shifts to the State to introduce admissible evidence to explain the conduct or demonstrate that it was harmless." *Id.* (citing *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005)). In determining whether the State has rebutted the presumption of prejudice, the trial court should consider the following factors: (1) the nature and content of the information or influence, including whether the content was cumulative of other evidence adduced at trial; (2) the number of jurors exposed to the information or influence; (3) the manner and timing of the exposure to the juror or jurors; and (4) the weight of the evidence adduced at trial. *Id.* at 654 (footnote omitted). Our Supreme Court has said that "[n]o single factor is dispositive. Instead, trial courts should consider all of the factors in light of the ultimate inquiry - whether there exists a reasonable possibility that the extraneous prejudicial information or improper outside influence altered the verdict." *Id.*

Our review of this issue is *de novo*, with the trial court's factual findings accompanied by a presumption of correctness, but no such presumption is given to the trial court's conclusions of law. *Id.* at 656; *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

The Defendant argues that the jury was exposed to extraneous prejudicial information. The Defendant, however, has failed to make the threshold showing that the jurors were exposed to extraneous prejudicial information that bore on a fact at issue in the case.

The trial court found that there was no proof that the jury was exposed to prejudicial information that bore on a fact at issue in this case. The Defendant wore street clothing to court rather than a jail jump suit. Numerous officers were present in the court for various reasons, and the two DRT officers were among them. The DRT officers were not seated at the defense table with the Defendant. Rather, the officers were seated with the general public in the gallery behind the Defendant. Whereas, the jury may have noticed the two officers, the Defendant has not carried his burden of showing that the jury was aware of the specific role of those two officers with relation to the Defendant's prior conduct in court.

Accordingly, the Defendant offered no proof that the jury was actually exposed to prejudicial information; thus, the Defendant falls short of meeting his threshold burden on this issue. The Defendant is not entitled to relief as to this issue.

15

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
s/ ***ROBERT W. WEDEMEYER***
ROBERT W. WEDEMEYER, JUDGE

16